OREGON-WASHINGTON R. & NAV. CO. v. PENSO et al.

(Circuit Court of Appeals, Ninth Circuit. February 13, 1917.)

No. 2739.

1. TRIAL ☞260(7)—INSTRUCTIONS—REQUESTS—REPETITION OF CHARGE.

In an action for the death of a man, struck by a railroad motorcar while crossing a bridge, it was not error to give a charge, requested by defendant, that if deceased saw, or by the exercise of reasonable care and caution could have seen, that the motorcar was approaching, and could have gotten into a place of safety and avoided being injured, he was guilty of negligence contributing to his own injury, and the verdict must be for defendant, where the court charged that, if the jury found the deceased contributed in any way proximately to his own death by his own negligence, they should return a verdict for defendant, and that he was bound to use ordinary care for his own safety, and if he failed to use ordinary care to keep or get out of the way of the approaching car the plaintiff cannot recover.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 657.]

2. RAILROADS ☞400(1, 10)—INJURIES TO PERSON ON TRACK—EVIDENCE—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

In an action for the death of a pedestrian, who was struck by a railroad motorcar while he was crossing the railroad bridge, evidence held sufficient to take to the jury the issues of the railroad's negligence and of deceased's freedom from contributory negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1365, 1367, 1377.]

In Error to the District Court of the United States for the Southern Division of the Eastern District of Washington; Edward E. Cushman, Judge.

Action by Esther Romi Penso and another against the Oregon-Washington Railroad & Navigation Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

The river that separates East Hoquiam from West Hoquiam, in the state of Washington, is crossed by a bridge used by the plaintiff in error in the operation of a line of railway in Chehalis county, state of Washington. That company was the defendant to the action brought in the court below by the widow and minor son of Haim Jack Penso, who was killed, while on the bridge, by a motorcar of the railroad company, at the time propelled by a gasoline engine.

The complaint alleged, among other things, that at the time of the accident the deceased was returning from his place of work in East Hoquiam to the place where he lived in West Hoquiam, as he was accustomed to do; that the bridge was at the time in question, and for a long time had been, used as a common passageway by the deceased and many other persons, with the knowledge and consent of the defendant company and of the Northern Pacific Railway Company, which practice had been continued for some years and was at the invitation of both of the companies mentioned, and which invitation, practice, and custom was well known to their agents, officers, and employés; that on the night in question, which was that of the 4th of November, 1913, the deceased, about 6 o'clock, "following the said custom and accepting the said invitation, was in the act of crossing said bridge as aforesaid, and had reached a point somewhere near the middle of said bridge, when a certain passenger car, propelled by gasoline engines and known as a gasoline motorcar, owned and operated by the defendant, approached said bridge, and the point where the said Haim Jack Penso was crossing said bridge, at a high and unusual rate of speed, and was carelessly and negligently driven upon the said Haim Jack Penso, in such a careless and negligent manner that the said Haim Jack Penso was knocked from the bridge into the waters of the Hoquiam river, and was either killed by the striking of the car or drowned as a result of being knocked from such bridge."

The answer of the defendant company, besides putting in issue the material allegations of the complaint, set up as affirmative defenses: First, contributory negligence on the part of the deceased; and, second, that the deceased knew and appreciated the dangers in undertaking to cross the bridge, and assumed the risk in doing so.

Upon the conclusion of all of the evidence the defendant moved for a directed verdict in its favor, and excepted to the ruling of the court denying the motion, assigning here the ruling as error.

Bridges & Bruener, of Aberdeen, Wash., Sullivan & Christian, of Tacoma, Wash., and Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for plaintiff in error.

Morgan & Brewer, of Hoquiam, Wash., and A. Emerson Cross, of Aberdeen, Wash., for defendants in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). The ground of the action being that the plaintiff in error's car approached the bridge, and the point where the deceased was crossing, at a high and unusual rate of speed, and was carelessly and negligently driven upon him, resulting in his death, we first look to see what, if any, evidence the record contains in support of those allegations.

There is very little real conflict in it upon any essential point involved

in the case. It shows without conflict that the bridge is approached from both ends by a trestle with a slight upgrade, and that between the points of commencement of the trestle, at the respective west and east ends, there are two curves, but that from the west end of the bridge proper (which, according to the evidence, is a drawbridge, enabling the water craft plying on the river to pass) the track is straight for from 250 to 300 feet westerly. The drawbridge was operated by a man in the tower house or engine room, over the turning gear in the center of the bridge. One G. M. Rogers was one of the towermen at the time in question, and he testified, among other things (his testimony being uncontradicted), that, including cars, trains, and switch engines, from 35 to 40 crossed the bridge each day—the evidence showing that the bridge was used in common by the Northern Pacific Railroad, the Milwaukee Railroad Company, and the plaintiff in error. There was but the one railroad bridge across the river between West and East Hoquiam, although there was at the time a wagon road bridge, on which there was also operated an electric road, a short distance from the railroad bridge, by which wagon road bridge the deceased, as we shall presently see, went each morning from where he lived in West Hoquiam, to the Coats Mill Factory in East Hoquiam, where he worked. In returning home from his work in the evening, however, the deceased, for more than a year previous to the accident, went by way of the railroad bridge, as did hundreds of other workmen, according to the evidence.

The motorcar of the plaintiff in error was operated between West Hoquiam and a place called Montesano, and made two trips each way each day. The car was about 76 feet in length, with a place at the end for the motorman, then next a compartment for baggage and express matter, then next a smoking compartment, and then the main space for passengers. Its schedule time for leaving West Hoquiam in the evening was 6 o'clock, and the evidence shows without dispute that it left on time on the occasion in question. So far from there being any evidence that the car approached the bridge or crossed it at a high and unusual rate of speed, as alleged in the complaint, it appears from the uncontradicted evidence that its speed, in this instance, at least, was only from 6 to 8 miles an hour. It also appears from positive testimony in the case that the bell on the motor car was an automatic air bell, started by a small valve in the cab, the opening of which valve starts the air to flow and the bell to ring; that on the occasion under consideration the bell was put in operation (as, according to the evidence, it always was) before leaving West Hoquiam, and rung continuously until the car was stopped after the accident; that there was no way to stop the bell, except by shutting the valve by the engineer; and that the bell could be heard a distance of from 1,000 to 1,200 feet. It appears in evidence without conflict that the bridge was equipped with a semaphore, by which signals were given to approaching cars and engines of the condition of the bridge—a red light being a signal to stop, and a green light the signal to proceed. It appears that the trains or cars approaching the bridge from either end were required to blow two whistles about a half block from the bridge

proper, which signal would be returned by the semaphore man and the appropriate light displayed, upon receiving which signal the engineer of the approaching car or train would answer by two short blasts of the whistle, indicating that he would proceed. Such, it appears, was the regulation and practice of the railroad companies using the bridge and the practice in the instant case. It also appears by uncontradicted testimony that this car was equipped with a strong headlight and threw its rays along the entire straight stretch of track that has been mentioned, on which the deceased and a companion, the witness Balabanas, were proceeding on their way westerly to their home from their place of work in East Hoquiam, the motorcar at the same time going easterly on its regular evening run from West Hoquiam to Montesano.

It is unnecessary to refer to the numerous witnesses introduced, both on the part of the plaintiff and the defendant company, to the effect that the bridge and its approaches were and for years had been used, at any and almost all times, as a footway in crossing the river by the hundreds of workmen engaged in work in the various mill plants that existed on both sides of the river, particularly in returning home in the evening after their day's work was done, very likely because the distance was shorter than by the wagon road bridge that has been referred to, but, whatever the cause, no question is made about the fact. And the evidence is abundant, both of witnesses on the part of the plaintiff, as well as those testifying for the defendant company, that until the present accident happened no one had ever been hurt in doing so by any train, car, or engine—their custom being, upon meeting such trains, cars, or engines, to step to the end of the ties of the road and lean against the various steel beams or uprights which constituted a part of the bridge, or else step down from the ties to the girders, and thus give way to the passage of the trains, engines, or motorcars, as the case might be.

Balabanas testified on behalf of the plaintiffs, among other things, as follows: That he and the deceased left the Coats shingle mill factory, where they had been working for about a year, at a quarter of 6 in the evening of the day the deceased was killed, and had reached the bridge at 6 o'clock (which was the same time the motorcar left the station in West Hoquiam going westerly). We extract from the testimony of the witness, as stated in the record, as follows:

When crossing the bridge, deceased and witness were walking together. At the time deceased was struck by the car, witness stopped to roll a cigarette, and Penso went on ahead. They were in the middle of the bridge when the car was approaching. That when walking across the bridge there were planks that they walked on, and were going towards Hoquiam. That witness did not know when the car was coming, but he and deceased were passing on the bridge every night. They were crossing the bridge every night. Witness did not know whether the car would cross the bridge at that time or not. The witness did not hear any whistle from the car. Did not hear any bell ringing. That the way he knew the car was coming was when he stopped to roll his cigarette, and deceased passed a few steps ahead, then the car passed right ahead. That when witness saw the car he started to walk, and when deceased was struck witness went over and dropped onto an iron post on the bridge. That he got over to the iron post by stepping on the rail and then

putting his hand upon the post. * * * That as the witness stopped deceased was right on the step, and deceased was struck by the car, and then the passengers and some of the brakemen came down the ladders and were looking for the body, and they only found his dinner pail. That witness stepped over and put his hand around the post and stopped there. Asked how soon he did that after he saw the light on the car, he answered it was about 24 feet. That after the witness saw the light of the car, and before he moved to the post, he put his arms around. Witness had walked 4 or 5 feet after he saw the car coming, then he put his hands around the post and stayed there, and then came down again. When the deceased was struck, witness dropped the post. That there was no place deceased could have gotten off the bridge, excepting the platform that deceased was going towards, after the car was seen. That there was no other room or platform, excepting the stairs. That Penso was killed, but that he did not see him. After witness saw the light of the car, deceased was running to cross the steps, and as he tried to cross the steps deceased was knocked down by the car. Deceased was trying to put his feet on the stairs when he was struck by the car. He meant, by the stairs, on the platform; right on the platform. That one of the feet of deceased was on the rail, and one on the platform. That after witness saw the light of the car there was no place deceased could have gotten to as a place of safety, excepting the platform towards which he was running. That as to why there was not any other place he did not know. There were only a few boards inside the rails, and no other room at all. That deceased could not have stepped off on the side, like witness did, because deceased was ahead, right close to the stairs. That there was no place on the side of the bridge where deceased could have got hold of before getting to the platform. That he did not know how many minutes it was after witness saw the light on the car until deceased was struck by the car, but that he did know that deceased was running to get to a place of safety.

The foregoing is the only testimony we find in the record from which the jury could have concluded or inferred that there was negligence on the part of the defendant company in not stopping the car before it and the approaching deceased came in contact, which was, according to the evidence, at the west end of the bridge proper, where there was a platform—there also being one in the middle and at the east end of the bridge proper. That testimony, however, also tended to show that the deceased was guilty of contributory negligence in running on the track of the defendant company towards its oncoming car, the light of which, according to the uncontradicted testimony, was plainly visible, after the car reached within about 300 feet of the west end of the bridge proper, clear through it, and far beyond. The jury might well have inferred and concluded that, when Balabanas stopped to roll his cigarette, the deceased might have gotten out of the way of the car by stepping to the end of the ties and leaning against one of the upright bars, instead of going ahead and taking chances in running to reach the platform at the end of the bridge.

[1] It is insisted on behalf of the appellant that the court below erred in refusing, as it did, to give this requested instruction:

"You are instructed that if you believe from the evidence that the deceased saw, or by the exercise of reasonable care and caution could have seen, that the motorcar was approaching the bridge, or was coming on the same, and you further believe that the deceased could at that time have gotten into a place of safety on such bridge, and thus avoided being injured, then the deceased would be guilty of negligence contributing to his own injury, and your verdict must be for the defendant."

A sufficient answer to the contention is that the court did instruct the jury substantially as was requested, as will be seen from the following excerpts from its charge:

"The defendant, having alleged contributory negligence on the part of the deceased, which it is averred proximately contributed to his death, if you get to that phase of the case, the burden of establishing the deceased's negligence, and that it proximately contributed to his death, rests upon the defendant.

"The order in which you would naturally take up the consideration of these issues would be, first, to determine what, if any, relationship this boy and this woman bear to the deceased. If there be a fair preponderance of the evidence that one was the wife, and is to-day the widow, and that the other was the son, then the next step would be logically to determine whether the deceased himself contributed in any way proximately to his own death, by his own negligence. If you find by a fair preponderance of the evidence that he did so, you would stop there, and return a verdict for the defendant. If you find that he was not himself guilty of contributory negligence, you would then pass to the next point, to determine whether the defendant, in any of the manners described in the complaint, was guilty of negligence, and whether it proximately contributed to the death of the deceased."

And again:

"The deceased man, while using the footpath on the bridge, in going across this river, was bound to use ordinary care for his own safety, and if he failed to use ordinary care to keep or get out of the way of the approaching car, the plaintiffs in this case cannot recover, even though you should find from a fair preponderance of the evidence that the defendant company, or its operatives, were negligent in the operation of the car."

See Grand Trunk Railway v. Ives, 144 U. S. 408, 433, 12 Sup. Ct. 679, 36 L. Ed. 485; Rio Grande Western Railway v. Leak, 163 U. S. 280, 287, 288, 16 Sup. Ct. 1020, 41 L. Ed. 160.

[2] While we are of the opinion that the evidence tending to show negligence on the part of the defendant company was slight, and that there was evidence tending to show contributory negligence on the part of the deceased, we conclude that both questions were properly submitted to the jury for determination.

The judgment is affirmed.